**In re PERMANENT SURFACE MINING REGULATION LITIGATION.**

**Appeal of PEABODY COAL COMPANY.**

No. 80–1308.

United States Court of Appeals,
District of Columbia Circuit.

Argued En Banc Oct. 23, 1980.

Decided April 1, 1981.

Certiorari Denied Oct. 5, 1981.
See 102 S.Ct. 106.

Tamm, Circuit Judge, dissented and filed opinion in which MacKinnon, Robb and Wilkey, JJ., joined.

MacKinnon, Circuit Judge, dissented and filed opinion.

Warner W. Gardner, Washington, D. C., with whom I. Michael Greenberger and James R. Bird, Washington, D. C., were on the brief, for appellant.

Michael A. McCord, Atty., Dept. of Justice, Washington, D. C., with whom James W. Moorman, Asst. Atty. Gen., Carl Strass, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellee, Secretary of the Interior. Robert L. Klarquist, Atty., Dept. of Justice, Washington, D. C., also entered an appearance for appellee.

L. Thomas Halloway, Richard Webb, Norman Dean, Terence L. Thatcher, Washington, D. C., were on the brief for appellee National Wildlife Federation. Jonathan Lash, Washington, D. C., was on the brief for appellee Natural Resources Defense Council.

Roger L. Chaffe, Asst. Atty. Gen., Com. of Va., Richmond, Va., was on the brief for amicus curiae urging reaffirmance.

Harvey M. Sheldon, Sp. Counsel, State of Ill., Chicago, Ill., was on the brief for amicus curiae urging reaffirmance.

Before McGOWAN, Chief Judge, and WRIGHT, TAMM, ROBINSON, MacKINNON, ROBB, WILKEY, WALD, MIKVA, EDWARDS and GINSBURG, Circuit Judges.

Opinion for the court filed by Circuit Judge MIKVA.

Dissenting opinion, in which Circuit Judges MacKINNON, ROBB and WILKEY join, filed by Circuit Judge TAMM.

Dissenting opinion filed by Circuit Judge MacKINNON.

MIKVA, Circuit Judge:

This case presents a narrow question concerning the relative authority of the Secretary of the Interior and the states in the administration of the Surface Mining Control and Reclamation Act of 1977 (Surface Mining Act, or Act), 30 U.S.C. §§ 1201–1328 (Supp. I 1977). The United States District Court for the District of Columbia held that the Act gives the Secretary rulemaking power to prescribe minimum information requirements for permit applications submitted to state regulatory agencies. We conclude that the Act does give the Secretary this authority, and accordingly affirm the judgment of the district court.

## I. THE ISSUE PRESENTED

The Surface Mining Act embodies Congress' recognition that "the expansion of coal mining to meet the Nation's energy needs makes even more urgent the establishment of appropriate standards to minimize damage to the environment and to productivity of the soil and to protect the health and safety of the public." Act § 101(d).[1] After an initial period of direct regulation by the Secretary, the Act contemplates a continuing partnership between the states and the federal government, with the Secretary providing oversight, advice, and back-up authority, and the states bearing the major responsibility for implementation of the Act. The crucial step in accomplishing this transition is a state's submission of its proposed regulatory program to the Secretary for his approval. The Sec-

retary may only approve the state program if he finds it capable of carrying out the exacting provisions of the Act, and consistent with his own regulations. Act § 503(a).

Whether regulation is under federal authority or an approved state program, persons wishing to engage in surface mining must obtain a permit from the regulatory authority. Act § 506(a). Permits may not be granted unless the applicant successfully carries the burden of establishing full compliance with the applicable program, and the applicant must submit detailed information from which the regulatory authority and interested citizens may judge compliance. Act §§ 510(b), 507(b). Section 507(b) lists a large number of items which, "among other things," a permit application must contain.

The Secretary's regulations for the permanent regulatory program, issued in March 1979, include rules concerning the content of acceptable state program submissions. See 44 Fed.Reg. 14,902, 15,312 (1979) (codified at 30 C.F.R. pts. 700–890 (1979)). These regulations specify minimum information that a state must require in a permit application, information which extends beyond the explicit information requirements detailed in the Act itself. See 30 C.F.R. pts. 778–784 (1979).

Various interested persons filed actions in the United States District Court for the District of Columbia, challenging the permanent regulations.[2] Appellant attacked the Secretary's information requirements in sweeping terms, denying that the Secretary possessed any power to promulgate regulations on that subject. Appellant also criticized numerous individual regulations as, for various reasons, beyond the scope of the Secretary's authority. In February 1980,

---

1. Sections of the Act, 30 U.S.C. §§ 1201–1328 (Supp. I 1977), are cited in this opinion by their designation in the Statutes at Large. The parallel United States Code citations for title V of the Act, §§ 501–529, are 30 U.S.C. §§ 1251–1279. Other sections to which frequent reference is made are:

 Section 101—30 U.S.C. § 1201
 Section 102—30 U.S.C. § 1202
 Section 201—30 U.S.C. § 1211

Section 405—30 U.S.C. § 1235.

2. The Act specifically provides that "[a]ny action by the Secretary promulgating national rules or regulations including standards pursuant to sections 501, 515, 516, and 523 shall be subject to judicial review in the United States District Court for the District of Columbia Circuit [sic]." Act § 526(a)(1).

the district court reached a decision on some of the many issues presented in the cases consolidated before it. The court concluded that "the structure of the Act, the general grants of rulemaking authority, and section 501(b) support the Secretary's power" to issue regulations requiring the states to demand more information than the statute itself requires. *In re Permanent Surface Mining Regulation Litigation*, Civ.No. 79–1144, mem. op. at 31 (D.D.C. Feb. 26, 1980). The district court entered a final judgment in accordance with rule 54(b) of the Federal Rules of Civil Procedure on that portion of its decision dealing with the Secretary's rulemaking power so that Peabody Coal Company could appeal that determination without delay. On July 10, 1980, a panel of this court reversed the judgment of the district court. Upon the Secretary's petition, we granted rehearing en banc and vacated the panel decision.

An illustration or two will suffice to demonstrate the absolute character of appellant's claim. Section 522(e)(5) of the Act forbids new surface coal mining operations "within three hundred feet from any occupied dwelling, unless waived by the owner thereof." The explicit information requirements of the Act, however, do not mandate that a permit application include any information from which it can be ascertained whether such owners have consented to the proposed operations. The Secretary's regulations require the operator to submit evidence of such consent with the permit appli-

cation. 30 C.F.R. § 778.16(c) (1979). Congress also directed the Secretary to promulgate "regulations directed toward the surface effects of underground coal mining operations," Act § 516(a), and to make such modifications in the requirements of the Act "as are necessary to accommodate the distinct difference between surface and underground coal mining," Act § 516(d). Understandably, the explicit information provisions of the Act do not anticipate all of the Secretary's modifications. *See, e. g.*, 30 C.F.R. § 784.14(d) (1979). Yet appellant denies that the Secretary has the power to issue any regulations requiring permit applications to include information that may be necessary to ensure compliance with section 522(e)(5) or the Secretary's modifications under section 516, unless that information is already demanded explicitly by the Act. Appellant insists that only the states have the power to increase the information requirements of the Act.

Our inquiry is narrow. We are called upon to determine only whether the Secretary has rulemaking authority to require that permit applicants submit *any* items of information beyond those enumerated in the Act.[3] The partial summary judgment we review does not extend to the question whether the regulations actually promulgated by the Secretary are permissible exercises of that authority. Challenges to individual regulations are being separately adjudicated in the court below, with varying results.[4] Appellant insists both in

---

**3.** Appellant argues that the Act forbids the Secretary to require information not included in sections 507 and 508 of the Act. Careful examination of the Act reveals that these sections do not exhaust the information that the Act directs permit applicants to submit. *See* Act §§ 510(b)(6) (requiring submission of written consent of surface owner), 510(c) (applicant must "file with his permit application" a list of violations of certain related laws), 506(b) (term of permit may not exceed five years unless applicant demonstrates longer term necessary to obtain financing), 510(b)(4) (permit for operations in area under study for designation as unsuitable for surface mining only to be granted if applicant demonstrates substantial legal and financial commitments made before January 1, 1977); *see* 30 C.F.R. §§ 778.15(b), 778.14(c), 778.17(b), 778.16(b) (1979), respec-

tively. We believe it only fair to recharacterize appellant's argument as one challenging permit information requirements beyond those of the Act, generally, so as to relieve appellant of an inadvertently underinclusive argument.

**4.** For example, on the same day that he upheld the Secretary's power to issue regulations on the subject of permit information, the district judge upheld specific requirements contained in 30 C.F.R. §§ 778.16(a) (identification of areas designated unsuitable for mining), 779.14(b) (analyses of strata above and immediately below the coal seam), 784.20 (subsidence control plan) (1979), and remanded for revision requirements contained in 30 C.F.R. §§ 779.20 & 780.16 (fish and wildlife information), 779.21 & 783.21 (soil survey information for non-prime farmland) (1979). He also rejected the Secre-

briefs and in oral argument to this court that the Secretary has no power to prescribe information requirements for permit applications.[5]

We have, therefore, no occasion to assess the Secretary's justifications for individual regulations. We neither approve nor disapprove any regulation, and our decision today in no way forecloses subsequent timely challenges to those regulations, either here or in the court below.

## II. THE ROLES OF THE STATES AND THE SECRETARY IN ADMINISTERING THE SURFACE MINING ACT

Congress chose a special kind of regulatory structure for the Surface Mining Act, in which the federal government shares administrative responsibility with the states. Rather than reposing all decisionmaking power with the Secretary of the Interior, Congress afforded the states an opportunity to propose regulatory programs of their own, conforming to the requirements of the Act and to regulations promulgated by the Secretary.[6] Under a state program, the state makes decisions applying the national requirements of the Act to the particular local conditions of the state. The Secretary is initially to decide whether the proposed state program is capable of carrying out the provisions of the Act, but is not directly involved in local decisionmaking after the program has been approved.

The essence of appellant's arguments against the Secretary's claimed rulemaking power is that it does violence to the special allocation of decisionmaking power effected by the statute's structure. Because the state has the "primary governmental responsibility" under an approved state program, Act § 101(f), appellant urges that the Secretary has no power to decide what information the state should have before it makes its decisions.

The Secretary responds that this argument exaggerates the independence of the state's role in administering an approved

---

tary's definition of "mine plan area" in 30 C.F.R. § 701.5 (1979), and suspended the application of all regulations in 30 C.F.R. pts. 779, 780, 783 & 784 (1979) to the extent they depend on that definition. *In re Permanent Surface Mining Regulation Litigation*, Civ.No. 79–1144 (D.D.C. Feb. 26, 1980).

5. *See, e. g.*, Appellant's Supplemental Brief on Rehearing En Banc at 13 ("We urge instead that the Secretary has no power to issue *any* regulation implementing the provisions of §§ 507 and 508.") (emphasis in original). Appellant explicitly acknowledges that it does not contest in this court the substantive validity of the individual regulations. "Peabody sought relief by preliminary injunction not only because of lack of authority in the Secretary but because of this massive and inflexible detail. It did not appeal the denial of relief on the latter ground." *Id.* at 11. Having thus properly identified the scope of the appeal, appellant nonetheless lapses periodically into attacks on the arrogance of the Secretary and the massive detail of his regulations, offering arithmetical demonstrations of the burdens the regulations impose. Appellant nowhere recognizes that the explicit requirements of sections 507 and 508 themselves are also massive, or estimates the expense or the quantity of paper that would be consumed if the Secretary had promulgated the statutory provisions verbatim as his regulations. At any rate, these allegations merely form part of the background for this case, and are not arguments we must address. The only

question before us is the *existence* of the Secretary's rulemaking authority, not whether he has abused it.

6. Section 503(a) of the Act provides, in part: Each State in which there are or may be conducted surface coal mining operations on non-Federal lands, and which wishes to assume exclusive jurisdiction over the regulation of surface coal mining and reclamation operations, . . . shall submit to the Secretary, by the end of the eighteenth-month period beginning on the date of enactment of this Act, a State program which demonstrates that such State has the capability of carrying out the provisions of this Act and meeting its purposes through—
(1) a State law which provides for the regulation of surface coal mining and reclamation operations in accordance with the requirements of this Act;
. . . .
(4) a State law which provides for the effective implementatio[n], maintenance, and enforcement of a permit system, meeting the requirements of this title for the regulatio[n] of surface coa' mining and reclamation operations for coal on lands within the State;
. . . .
(7) rules and regulations consistent with regulations issued by the Secretary pursuant to this Act.

program and slights the Secretary's responsibilities in approving and overseeing such a program. Appellant, according to the Secretary, would place an unjustified limitation on his approval role by denying his right to ask the states to seek more information in the permit application than explicitly required by the statute.

### A. The State's Role in Administering an Approved State Program

In an approved and properly enforced state program, the state has the primary responsibility for achieving the purposes of the Act. First, the state is the sole issuer of permits. In performing this centrally important duty, the state regulatory authority decides who will mine in what areas, how long they may conduct mining operations, and under what conditions the operations will take place. See Act §§ 506, 510. It decides whether a permittee's techniques for avoiding environmental degradation are sufficient and whether the proposed reclamation plan is acceptable. Act § 510(b). The state sets the amount of the bond to be posted by the operator, and inspects the mine to determine compliance. Act §§ 509, 517. When permit conditions are violated, the state is charged with imposing appropriate penalties. Act § 518(i).

Finally, it is with an approved state law and with state regulations consistent with the Secretary's that surface mine operators must comply. See Act § 503(a), 518(i). Administrative and judicial appeals of permit decisions are matters of state jurisdiction in which the Secretary plays no role. Act § 514.[7]

As long as the state properly enforces its approved program, it is the exclusive "on the scene" regulatory authority.[8] It is, essentially, the entity that applies the general standards of the Act to the particular geographical and geological circumstances of the state. Congress cited the flexibility achieved in this allocation of regulatory functions as its reason for leaving "primary governmental responsibility" with the states. Act § 101(f).

### B. The Secretary's Role in Approving and Overseeing a State Program

Once the state has assumed all these functions, the Secretary's role is primarily one of oversight. The statute requires occasional federal on-site inspections "to evaluate the administration of approved State programs." Act § 517(a). Interested persons may also report suspected violations of the Act or of state-imposed permit conditions to the Secretary, and if he has reason to believe the allegations he must notify the state regulatory authority. Act § 521(a). If the state fails to take appropriate action, the Secretary is to order a federal inspection of the mine site. Id. Violations that threaten imminent environmental harm are to be halted by a cessation order from the Secretary. Act § 521(a)(2).

The Secretary's oversight function is shared in part by the public, which is given the right to sue in federal court, to compel compliance with the state program and its permits. Act § 520. Both the Secretary and the public have access to a large body of information, including nonconfidential permit application information, to facilitate this enforcement role. Act §§ 507(e), 517(f); see 30 C.F.R. § 840.14 (1979).

The Secretary's ultimate power over lax state enforcement is set out in section 521(b) of the Act. When the Secretary determines that violations result from a state's lack of intent or capability to enforce the state program, he is to enforce permit conditions directly, and to take over the entire permit-issuing process himself.

---

7. The independence of a state administering an approved state program under the Surface Mining Act may be contrasted with the continuing role of the Environmental Protection Agency after a state has assumed responsibility for pollution discharge permits under the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1376 (1976 & Supp. II 1978). The EPA Administrator retains veto power over individual permit decisions under that statute, see id. § 1342(d).

8. Except for federal inspectors, whose intermittent presence on the scene is required by the Act even when an approved state program is in control. Act § 517.

Direct intervention by the Secretary in the operation of state regulatory programs is clearly intended as an extraordinary remedy. *See* H.R.Rep.No. 218, 95th Cong., 1st Sess. 129 (1977), *reprinted in* [1977] U.S. Code Cong. & Ad. News 593, 661. The Secretary's primary means of guaranteeing effective state programs lies in his approval function at the beginning of the process.

A state wishing to take over regulatory responsibility for administering the Act within its borders must submit a proposed state program to the Secretary for his approval. Act § 503. The Secretary may only approve a program if he determines that the state "has the capability of carrying out the provisions of this Act and meeting its purposes." Act § 503(a). The proposed state program must include "a State law which provides for the effective implementatio[n], maintenance, and enforcement of a permit system," Act § 503(a)(4), and "rules and regulations consistent with regulations issued by the Secretary pursuant to this Act," Act § 503(a)(7). The Secretary is required to hold a public hearing, to solicit the views of other federal agencies, and to obtain the written concurrence of the Environmental Protection Agency with respect to certain aspects of the state program. Act § 503(b).

## C. *Congressional Intent and the Tradition of State Regulation*

A major premise of appellant's argument is that Congress deliberately minimized the federal role in administration of the Act out of deference to state prerogatives. Appellant denies that the statute is based primarily on environmental concerns, and insists that an "even more fundamental purpose of the Act . . . is to preserve the federal structure of our nation and to leave with the states primary responsibility for this land-use regulation." [9] Congress' special solicitude for the states' traditional role in controlling local land use, appellant claims, prevented Congress from delegating to the Secretary authority to dictate permit information requirements to the states.

Our own examination of the Act and its legislative history reveals a very different congressional assessment of the tradition of state surface mining regulation. The legislative history contains significant expressions of congressional dissatisfaction with state mining regulation practices:

> [D]espite claims from some quarters that state reclamation laws have improved so significantly that Federal mining standards are no longer needed, the hearing record abounds with evidence that this is simply not the case. For a variety of reasons, including the reluctance of the State to impose stringent controls on its own industry, serious abuses continue.

H.R.Rep.No. 218, 95th Cong., 1st Sess. 58 (1977), *reprinted in* [1977] U.S.Code Cong. & Ad. News 593, 596. Congress preferred to leave primary governmental responsibility with the states "because of the diversity in terrain, climate, biologic, chemical, and other physical conditions in areas subject to mining operations," Act § 101(f), but skepticism about the states' willingness to implement the federal program justified the Secretary's continuing oversight role.

> While it is confident that the delegation of primary regulatory authority to the States will result in adequate State enforcement, the committee is also of the belief that a limited Federal oversight role as well as increased opportunity for citizens to participate in the enforcement program are necessary to assure that the old patterns of minimal enforcement are not repeated.

H.R.Rep.No. 218, 95th Cong., 1st Sess. 129 (1977), *reprinted in* [1977] U.S.Code Cong. & Ad.News 593, 661.

Congress announced its willingness, "wherever necessary, [to] exercise the full reach of Federal constitutional powers to insure the protection of the public interest through effective control of surface coal mining operations." Act § 102(m). Nationwide standards were "essential in order to insure that competition in interstate commerce among sellers of coal produced in

---

**9.** Appellant's Supplemental Memorandum on Appeal at 4.

different States will not be used to undermine the ability of the several States to improve and maintain adequate standards on coal mining operations within their borders." Act § 101(g).[10] Congress' concern about the states' ability to withstand economic temptation extended to the very area of permit information with which we are dealing:

> Experience has shown that without a thorough and comprehensive data base presented with the permit application, and absent analysis and review both by the agency and by other affected parties based upon adequate data, th[i]s judgment has often traditionally reflected the economic interest in expanding a State's mining industry. Valid environmental factors tend to receive short shrift.

H.R.Rep.No. 218, 95th Cong., 1st Sess. 91 (1977), *reprinted in* [1977] U.S.Code Cong. & Ad.News 593, 627.

Thus, the legislative history of the Act, the declarations of congressional purpose it contains, and the allocation of authority it creates between the Secretary and the states confirm that Congress was not interested in perpetuating the existing tradition of state mining regulation, and that Congress saw the need for both federal standards and federal oversight to guarantee an effective change. Congress did, not withhold powers that the Secretary might require in his efforts to safeguard federal interests.[11]

## III. THE SOURCE OF THE SECRETARY'S RULEMAKING POWER

The Secretary identifies two grants of rulemaking power in the Act as the source of his authority to promulgate regulations expanding the list of information required to be submitted in permit applications. The first of these provisions is a general rulemaking grant typical of statutes that, like the Act, delegate extensive responsibilities to administrative agencies.[12] It provides

---

**10.** The prevention of this kind of destructive interstate competition is, of course, a traditional role for Congress' power under the Commerce Clause. *See, e. g., United States v. Darby*, 312 U.S. 100, 121–23, 61 S.Ct. 451, 460–61, 85 L.Ed. 609 (1941).

**11.** We note that, during the Senate debates on the Act, Senators Johnston and Domenici introduced what they referred to as "the States rights amendment." 123 Cong.Rec. 15,581 (1977). The amendment would have freed the states from compliance with all other provisions of Title V of the Act so long as they enacted environmental performance standards at least as stringent as those contained in Act §§ 515, 516. The states' rights amendment was defeated, 51 votes to 39. 123 Cong.Rec. 15,591 (1977). Appellant's "federalism" argument resembles to some extent an attempt to attribute the intent embodied in this amendment to the Congress that rejected it.

We also observe that appellant urged, earlier in this appeal, that the Senate's passage of a bill that would have freed the states from their obligation to conform to the Secretary's regulations was "entitled to some consideration" as proving "that Congress meant what it said" in section 507. Appellant's Brief on Appeal at 28. That bill has since died, and appellant professes to have emerged "with renewed respect [for] the settled rule that post-enactment history is not a useful guide to Congressional intention," *i. e.*, that the failure of Congress to pass the bill does not weigh against their argument. Appel-

lant's Supplemental Brief on Rehearing En Banc at 18. We agree that the intent of the 95th Congress is determinative in interpreting the Act as passed in 1977; evidence of that intent is not to be sought in actions taken or not taken by subsequent Congresses. *See Regional Rail Reorganization Act Cases*, 419 U.S. 102, 132, 95 S.Ct. 335, 353, 42 L.Ed.2d 320 (1974).

**12.** *See e. g.*, § 105 of the Truth in Lending Act, 15 U.S.C. § 1604 (1976):

> The Board shall prescribe regulations to carry out the purposes of this subchapter. These regulations may contain such classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Board are necessary or proper to effectuate the purposes of this subchapter, to prevent circumvention or evasion thereof, or to facilitate compliance therewith;

§ 303(r) of the Communications Act of 1934, 47 U.S.C. § 303(r) (1976):

> Except as otherwise provided in this chapter, the Commission from time to time, as public convenience, interest, or necessity requires, shall—
>
> . . . .
>
> (r) Make such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this chapter, or any international radio or wire com-

that the Secretary shall "publish and promulgate such rules and regulations as may be necessary to carry out the purposes and provisions of this Act," Act § 201(c)(2). The second source is a more specific rulemaking grant, tied to the provisions of title V of the Act, in which the permit provisions are found. It requires the Secretary to

> promulgate and publish in the Federal Register regulations covering a permanent regulatory procedure for surface coal mining and reclamation operations performance standards based on and conforming to the provisions of title V and establishing procedures and requirements for preparation, submission, and approval of State programs and development, and implementation of Federal programs under the title.

Act § 501(b) (emphasis added).[13]

### A. The Secretary's Interpretation

■ The Secretary has cited sections 201(c) and 501(b) of the Act as authority for his rulemaking, and has viewed them as empowering him to expand the permit information requirements beyond those specified in the Act. As Congress recognized, "[t]he informational and environmental requirements of this [Act] are its most vital provisions." S.Rep.No.128, 95th Cong., 1st Sess. 53 (1977). The importance of an adequate data base to state decisionmaking, federal supervision, and citizen oversight makes the state program's information-gathering provisions crucial to the success of the Act. The Secretary has concluded that the explicit information provisions included in the Act should be supplemented to guarantee its effective implementation. As the interpretation favored by the agency responsible for administering the Act, this conclusion is entitled to some deference. See Miller v. Youakim, 440 U.S. 125, 145 n.25, 99 S.Ct. 957, 969 n.25, 59 L.Ed.2d 194 (1979). Absent a contrary indication in the statute, we should accept the Secretary's judgment, for it is not

> a reasonable canon of interpretation [to assume] that the draftsmen of acts delegating agency powers, as a practical and realistic matter, can or do include specific consideration of every evil sought to be corrected.... [This] is precisely one of the reasons why regulatory agencies ... are created, for it is the fond hope of their authors that they bring to their work the expert's familiarity with industry conditions which members of the delegating legislatures cannot be expected to possess.

American Trucking Ass'ns v. United States, 344 U.S. 298, 309–10, 73 S.Ct. 307, 314, 97 L.Ed. 337 (1953).

■ Deference to the administering agency is particularly appropriate when a complex regulatory statute emerges from a process of difficult legislative gestation. The Surface Mining Act was the result of a protracted effort, dating back to the Ninetieth Congress, and including presidential veto of bills passed by the Ninety-third and Ninety-fourth Congresses.[14] From such a process of compromise and adjustment, a

---

munications treaty or convention, or regulations annexed thereto, including any treaty or convention insofar as it relates to the use of radio, to which the United States is or may hereafter become a party;

§ 501 of the Federal Water Pollution Control Act, 33 U.S.C. § 1361 (1976):

The Administrator is authorized to prescribe such regulations as are necessary to carry out his functions under this chapter. Interpretations of the scope of these provisions may be found in Mourning v. Family Publications Service, Inc., 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318 (1973), F.C.C. v. National Citizens Committee for Broadcasting, 436 U.S. 775, 793, 98 S.Ct. 2096, 2111, 56 L.Ed.2d 697 (1978), and E. I. du Pont de Nemours & Co. v. Train, 430 U.S. 112, 132–33, 97

S.Ct. 965, 976–77, 51 L.Ed.2d 204 (1977), respectively. See also note 15 infra.

13. Section 507(b) requires the permit application to "contain, among other things," the items listed in its numbered paragraphs. This language demonstrates that Congress never intended to prohibit the administrators of the Act from seeking information beyond that specified in the statute, but it does not clarify the distribution of power between the Secretary and the states. We do not view section 507(b) itself as a grant of power to the Secretary.

14. See H.R.Rep.No.218, 95th Cong., 1st Sess. 57–61 (1977), reprinted in [1977] U.S.Code Cong. & Ad.News 593, 595–99.

symmetrical statute containing explicit answers to every question of administrative implementation is unlikely to emerge.

Appellant would insist that deference is due, not to the Secretary, but to the individual state regulatory agencies that bear primary responsibility for enforcement of the Act. Appellant views this "primary" responsibility as paramount and final responsibility. Our examination of the Secretary's approval and oversight roles convinces us that this argument misconstrues the statute. Once a state program has been approved, the state regulatory agency plays the major role, with its greater manpower and familiarity with local conditions. It exercises front-line supervision, and the Secretary will not intervene unless its discretion is abused. But ultimate responsibility for guaranteeing effective state enforcement of uniform nationwide minimum standards lies with the Secretary, and his duty to disapprove proposed state programs that he considers ineffective may not be obstructed by a policy of judicial deference to the state agencies proposing those programs. This is particularly true when it comes to seeking the information from the permittees on which his oversight will be based.

B. *Interpretation of the Rulemaking Provisions*

 Appellant argues that the sections of the Act on which the Secretary relies for his rulemaking powers confer no substantive authority at all, and must instead be interpreted as routine housekeeping and procedural provisions. We disagree.

Section 201(c)(2) of the Act empowers the Secretary to "publish and promulgate such rules and regulations as may be necessary to carry out the purposes and provisions of this Act." Appellant urges that the Secretary's interpretation of section 201(c)(2) would give him unlimited power to enact

rules, destroying the intended structure of the Act by drowning the states in a sea of irrelevant and time-consuming regulations. But as this court observed of the Clean Air Act's similar rulemaking grant,[15] "[s]uch a provision does not provide the Administrator with *carte blanche* authority to promulgate any rules, on any matter relating to the ... Act, in any manner that the Administrator wishes." *Citizens to Save Spencer County v. E.P.A.*, 600 F.2d 844, 873 (D.C.Cir.1979). The Secretary's regulations must not be arbitrary, capricious, or inconsistent with the Act, and section 526(a)(1) of the Act provides for review of the individual regulations on that basis in the district court. Appellant is participating in that process in the district court, and nothing we decide today forecloses appellant's challenges to individual regulations.

Appellant's other argument against the Secretary's interpretation of section 201(c)(2) is a quantitative one. Because the Act contains, in addition to section 201(c)(2), twenty-one *specific* grants of rulemaking power, appellant maintains, either those specific grants or section 201(c)(2)'s general grant must be redundant—and the 21:1 ratio in favor of the specific grants demonstrates that it is the interpretation of section 201(c)(2) that is erroneous. Rather than conferring general rulemaking power, in appellant's view, that section merely empowers the Secretary to engage in "routine housekeeping," such as setting up rules for distribution of government funds, and allocating authority among his employees. Appellant urges as a proposition of administrative law that the existence of specific grants must eviscerate a general grant of rulemaking power. That proposition cannot be squared with recent Supreme Court decisions relying on general rulemaking grants to uphold rulemaking authority despite the presence of specific grants in the statutes scrutinized. *See, e. g., E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112,

**15.** Section 301(a)(1) of the Clean Air Act, 42 U.S.C. § 7601(a)(1) (Supp. I 1977), provides:

The Administrator is authorized to prescribe such regulations as are necessary to carry out his functions under this Act. The Administrator may delegate to any officer or employee of the Environmental Protection Agency such of his powers and duties under this Act, except the making of regulations, as he may deem necessary or expedient.

132, 97 S.Ct. 965, 976, 51 L.Ed.2d 204 (1977) (general rulemaking grant in § 501 of Federal Water Pollution Control Act, 33 U.S.C. § 1361 (1976), supports issuance of categorical effluent limitations under § 301, 33 U.S.C. § 1311 (1976), despite explicit specific rulemaking grants in, *e. g.*, §§ 303, 304, 306, and 307, 33 U.S.C. §§ 1313, 1314, 1316, 1317 (1976)); *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973) (general rulemaking grant in § 105 of the Truth in Lending Act, 15 U.S.C. § 1604 (1976), supports prophylactic "Four Installment Rule," despite explicit specific rulemaking grants in, *e. g.*, §§ 123, 125, 126, and 127, 15 U.S.C. §§ 1633, 1635, 1636, 1637 (1976)).

■ The Secretary also relies on section 501(b) of the Act as support for his authority. This section directs the Secretary to promulgate regulations "establishing procedures and requirements for preparation, submission, and approval of State programs." Appellant insists that the evident meaning of this section is that the Secretary may set out "mechanical and procedural provisions" governing formal aspects of the submission and approval process. Appellant's Supplemental Brief on Rehearing En Banc at 28.

We recognize that the language of section 501(b) is not entirely lucid, but the Secretary's reading is a reasonable one, and is supported by the use of similar language in another provision of the Act. Section 405 deals with state submission of plans for reclamation of abandoned mines, and requires the Secretary to

promulgate and publish in the Federal Register regulations covering implementation of an abandoned mine reclamation program incorporating the provisions of title IV and *establishing procedures and requirements for p[re]paration, submission, and approval of State programs* consisting of the plan and annual submissions of projects.

Act § 405(a) (emphasis added). Section 405(d) instructs the Secretary to turn over exclusive responsibility for reclamation programs to the states if they submit an ac-

ceptable program. The Secretary is to "monitor the progress and quality of the program," Act § 405(i), and he

shall withdraw such approval and authorization if he determines upon the basis of information provided under this section *that the State program is not in compliance with the procedures, guidelines, and requirements established under subsection 405(a).*

Act § 405(d) (emphasis added). This continuing duty to withdraw approval of noncomplying state programs provides the Secretary's only power to revoke the state's authorization to administer the reclamation program. It would be unreasonable to assume that this severe sanction was intended to be invoked when the Secretary realizes that in approving the program initially he had overlooked a procedural defect, but not when experience demonstrates that the state is conducting an inadequate program. The clear implication of the language of section 405(d) is that the Secretary has authority under section 405(a) to establish procedures and requirements that have substantive content beyond the specification of procedural formalities for submission of state programs. It is therefore quite reasonable to read the identical language in section 501(b) as granting equally substantive powers.

Appellant offers only one argument in favor of its own reading of section 501(b). This is a variant of the reductio ad absurdum suggested in connection with section 201(c)(2). Appellant urges that if the Secretary does have rulemaking authority in the area of program approval, he can dictate every detail of the states' programs, and thereby destroy their role in flexible implementation of the Act. But as we have pointed out earlier, the power to issue regulations is not the power to issue *any* regulations. The Secretary has no more *carte blanche* under section 501(b) than he has under section 201(c)(2).

Appellant's misconception of the role of section 501(b) is based on a more fundamental misunderstanding. Appellant has argued in its briefs and at oral argument that

even if the Secretary may withhold approval of a state program because its permit information requirements fail to include necessary items not explicitly required by the Act, he may not advise the states of his additional requirements by regulation. Instead, he must proceed by adjudication on a case-by-case basis. Appellant's view cannot be reconciled with a significant body of case law favoring the use of rulemaking where agencies have adjudicatory power over the subject and at least some rulemaking authority.

In *National Petroleum Refiners Ass'n v. F.T.C.*, 482 F.2d 672 (D.C.Cir.1973), *cert. denied*, 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974), this court upheld the power of the FTC to issue substantive rules governing its adjudications. Examining a line of cases including *United States v. Storer Broadcasting Co.*, 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956), and *National Broadcasting Co. v. United States*, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943), the court recognized an "obvious judicial willingness to permit substantive rulemaking to undercut the primacy of adjudication in the development of agency policy." 482 F.2d at 679. The court praised the agency's use of rulemaking as a method for announcing new norms of conduct:

> [T]here is little question that the availability of substantive rule-making gives any agency a valuable resource-saving flexibility in carrying out its task of regulating parties subject to its statutory mandate. More than merely expediting the agency's job, use of substantive rule-making is increasingly felt to yield significant benefits to those the agency regulates. Increasingly, courts are recognizing that use of rule-making to make innovations in agency policy may actually be fairer to regulated parties than total reliance on case-by-case adjudication.

*Id.* at 681. This approbation may also be seen in a large body of cases that have rejected claims that a given agency may operate only on a case-by-case basis, and have likewise rejected crabbed interpretations of those agencies' rulemaking powers. *See, e. g., E.I. du Pont de Nemours & Co. v.*

*Train*, 430 U.S. 112, 126–35, 97 S.Ct. 965, 974–78, 51 L.Ed.2d 204 (1977) (national effluent limitations permissibly imposed by regulation on state-issued permits under § 301 of the Clean Water Act); *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 619–21, 93 S.Ct. 2469, 2478–79, 37 L.Ed.2d 207 (1973) (Food and Drug Administration may deny efficacy hearings to manufacturers who have not undertaken adequate clinical investigations conforming to regulations); *cf. Permian Basin Area Rate Cases*, 390 U.S. 747, 774–77, 88 S.Ct. 1344, 1363–65, 20 L.Ed.2d 312 (1968) (area rates rather than individual natural gas rates may be set by Federal Power Commission).

The rationale of *National Petroleum* and kindred cases lends additional strength to our conclusion that both sections 201(c)(2) and 501(b) of the Surface Mining Act authorize the Secretary to issue rules governing approval of state programs. Appellant's arguments in favor of a trivializing construction of these provisions are wholly without merit. The only remaining question is whether some other evidence demonstrates that Congress intended to exclude from the Secretary's authority the power to require permit information that he determines to be necessary to an effective program.

## C. "Common Sense" and Exhaustion

Appellant's most significant argument against the Secretary's rulemaking power is the claim that, even if the Secretary has some authority to promulgate criteria for the approval of state programs, the explicit permit application provisions of the Act were intended as the exclusive federal list of necessary data. Appellant deduces this limit on the Secretary's power from two premises—a "common sense" rule of regulatory authority, and the exhaustive length and detail of the explicit statutory provisions.

■ Appellant insists that granting the Secretary the power to expand the permit information requirements would defy com-

mon sense: "The Congress cannot reasonably be supposed to have created an administrative structure so bizarre that the agency which has the exclusive power to decide the issues is powerless to determine the information which it needs to reach that decision." Appellant's Supplemental Brief on Rehearing En Banc at 24. Because the state regulatory authority has the power, not subject to federal review, to make permit-issuing decisions, the state must have the power to specify the information that applicants submit.

Of course, the superficial appeal of this "common sense" argument is somewhat undercut when we recognize that the Secretary has only purported to promulgate *minimum* information requirements, and has not sought to limit the state's ability to require *further* data from applicants. And appellant must admit that the Act itself grossly violates this maxim: subsection 507(b) alone contains seventeen numbered paragraphs specifying information that the state regulatory authority *must* require.

The conclusive answer to appellant's "common sense" argument, however, is that even if individual state permit decisions are unreviewable, the state's overall performance in administering the Act is not. Congress believed that guaranteeing effective state enforcement required the vigilance of both the Secretary and the public, and so provided that permit applications, as well as inspection reports, must be available to the public. Act §§ 507(e), 517(f). Since the Secretary must use the information submitted with permit applications in evaluating the continuing compliance of the state permit process with the Act, there is nothing "bizarre" about allowing the Secretary to tell the states that they need more information to meet their responsibilities.

Appellant next argues that sections 507 and 508 of the Act are carefully devised, limited exceptions to the "common sense" rule, and that they were clearly intended to exhaust federal intervention into the information-gathering process. But the Act itself and its legislative history do not demonstrate such an intent.

We have already observed in passing that, although appellant refers to sections 507 and 508 as the only information requirements of the Act, other scattered sections in title V also demand information from permit applicants. *See* note 3 *supra*. This technical observation is relevant here, because it tends to rebut the suggestion that sections 507 and 508 comprise a compact, meticulous listing of all the information that Congress considered essential for permit decisionmaking. The addition of other information requirements in scattered sections suggests ad hoc responses to perceived needs for data rather than an integrated effort to produce a comprehensive list.[16]

The House Committee report contains a more plausible explanation of the function sections 507 and 508 were intended to serve. After discussing the need for a "thorough and comprehensive data base" in language we have already quoted, the report continues: "To meet this problem the bill delineates in detail *the type of information* required in permit applications in sections 507 and 508 and the criteria for assessing the merits of the application in section 510." H.R.Rep.No.218, 95th Cong., 1st Sess. 91 (1977), *reprinted in* [1977] U.S.Code Cong. & Ad.News 593, 622 (emphasis added). Because of the importance of information to a proper decision by the regulatory authority and to effective oversight by the Secretary, Congress included a detailed list of the *type* of information that would have to be at the state's disposal. Such a list is not necessarily exhaustive, and does not necessarily rep-

---

**16.** Even the list in section 507 itself was not the product of a unified analytic effort. Subsection 507(g), for example, requiring submission of a "blasting plan" with the permit application, was not a feature of the bill vetoed by President Ford in 1975, or of the version reported by the Senate Committee on Energy and Natural Resources in 1977. *See* H.R.Rep.No.189, 94th

Cong., 1st Sess. 26–29 (1975) (conference report); S.Rep.No.128, 95th Cong., 1st Sess. 16–18 (1977). It was added by a Senate floor amendment, to conform with the bill reported by the House Committee on Interior and Insular Affairs and passed by the House. *See* 123 Cong.Rec. 15,741 (1977); H.R.Rep.No.218, 95th Cong., 1st Sess. 23 (1977).

resent Congress' judgment that the states should be free to decide for themselves whether to seek any other information.

The Act itself contains a persuasive counterexample to the suggestion that detailed enumerations must be exhaustive. Section 515 spells out the Act's central environmental performance standards. Counting the pages in *Statutes at Large*, we find that section 515 is roughly twice the length of sections 507 and 508 combined. Section 515(b) alone contains twenty-five numbered paragraphs containing directives as specific as "[to] refrain from the construction of roads or other access ways up a stream bed or drainage channel or in such proximity to such channel so as to seriously alter the normal flow of water," Act § 515(b)(18). Yet the legislative history makes absolutely clear the expectation that the Secretary would flesh out these requirements in his regulations:

> The committee believes that it has struck a balance between legislation which merely frames performance standards in terms of general objectives and standards which are cast in terms more detailed than those generally found in regulatory legislation. In choosing a middle path, the committee is mindful of the past failures on the State level and thus bases its approval of H.R. 2 on the expectation that Federal regulations promulgated under the act will fully implement the environmental performance standards. Obviously, the mere reproduction of the statutory environmental performance standards in the regulations would be inadequate.

H.R.Rep.No.218, 95th Cong., 1st Sess. 85 (1977), *reprinted in* [1977] U.S.Code Cong. & Ad.News 593, 622. Although the legislative history does not contain a similar exhortation regarding permit applications, we cannot conclude that the mere length or specificity of portions of sections 507 and 508 manifests a desire to exclude the Secretary's rulemaking powers from their domain.

The Act contains numerous generally phrased and specifically detailed limitations on the freedom of surface mine owners to operate as they please. Some of these limitations are reflected in the permit application provisions, and some are not; the legislative history does not enlighten us as to the reasons for Congress' selectivity. Appellant would have us rule that the statutory list is exhaustive, and that the Secretary never has the power to supplement that list when he concludes that further information is needed for the proper administration of the Act. We find that sections 507 and 508 represent a diligent and comprehensive congressional effort to guide the Secretary with respect to the type of information a permit application should require. Appellant has not demonstrated a congressional intent to make these provisions an exclusive federal list.

## IV. CONCLUSION

The Surface Mining Control and Reclamation Act of 1977 enacts a national plan to alleviate the harmful effects of surface mining. Because of past failures on the state level, the Act provides for national standards relating to environmental performance, and federal oversight of the state programs applying those standards to local geographic conditions. Before the Secretary may approve a state program, he must conclude that the program is sufficient to carry out the purposes of the Act.

We hold that the Act does grant the Secretary rulemaking power enabling him to specify by regulation criteria necessary for his approval of a proposed state program. We hold that the Act's explicit listings of information required of permit applicants are not exhaustive, and do not preclude the Secretary from requiring the states to secure additional information needed to ensure compliance with the Act. This question concerning the existence of the Secretary's authority is the only question decided and appellant is free to continue to contest the specific regulations in the district court. The judgment of the district court is

*Affirmed.*

TAMM, Circuit Judge, dissenting:

We are confronted in this case with interpreting an act of Congress whose linguistic excesses make its exact meaning seemingly difficult to ascertain. Those difficulties impel my brethren of the majority, however, to lose sight of the congressional objective. I believe that it is not necessary to rely on remote inferences to ascertain the obvious design of the legislation. It is not necessary to draw upon a legal stamp collection, to utilize ideological mutations, or to create a legal "bodyguard of definitions, conclusions, corollaries, propositions explicit and propositions implicit" [1] to determine the intent of the Congress and the purpose of the Act. No amount of legal acrobacy can dispel the actual wording of the statute in placing prime responsibility in the states for primarily programming the coal mining regulations. In the hope that the reasoning set out hereafter will magnetize legal scholars to a true appreciation of the law as Congress actually intended it to be, I set out my interpretation of the statute under consideration. In some areas I shall be required to enter already well plowed fields.

In this appeal from a partial final judgment of the United States District Court for the District of Columbia, we must determine whether the Secretary of the Interior may prescribe minimum requirements for coal-mining permit applications that states must adopt before they can assume authority for regulating coal mining within their borders pursuant to the Surface Mining Control and Reclamation Act of 1977 (Surface Mining Act or Act), 30 U.S.C. §§ 1201–1328 (Supp. I 1977). I conclude that the Secretary lacks the power to demand that states require applicants to provide more information than that specified in sections 507 and 508 of the Act, 30 U.S.C. §§ 1257–1258. Therefore, I would reverse the judgment of the district court and remand the case with instructions to remand the regulations at issue to the Secretary.

## I.

Congress adopted the Surface Mining Act in an effort to balance the need for coal in satisfying the nation's energy requirements against the environmental dangers posed by mining operations. See Act § 102, 30 U.S.C. § 1202. Congress also concluded that "because of the diversity in terrain, climate, biologic, chemical, and other physical conditions, the primary governmental responsibility for developing, authorizing, issuing, and enforcing regulations for surface mining and reclamation operations subject to this Act should rest with the States . . . ." Id. § 101(f), 30 U.S.C. § 1201(f). Congress carefully devised a statutory scheme that would take all these concerns into account. As we recently noted:

The Act provides a truly federalist distribution of regulatory authority for the coal-mining industry. After a transition period of direct regulation under the Secretary of the Interior, each state in which coal is mined has the option of submitting to the Secretary its own program for supervising mining and reclamation within its borders. Act § 503, 30 U.S.C. § 1253. The Secretary, after following certain procedures, must approve the program if he finds it adequate to protect environmental concerns that lay behind the adoption of the Act. Once its plan is approved, the state assumes responsibility for enforcing the Act. Id. If a state fails to submit a satisfactory program, or if it does not wish to assume jurisdiction over mining within its borders, the Secretary must devise a program for that state suited to its particular needs. Id. § 504(a), 30 U.S.C. § 1254(a). Whether regulation is in federal or state hands, a firm wishing to engage in surface mining must obtain a permit from the regulatory authority before it may begin or continue its operations. Id. § 506(a), 30 U.S.C. § 1256(a). The Act spells out in detail the minimum information that an applicant must submit to the regulatory authority to accompany its permit request. See id. § 507(b), 30 U.S.C. § 1257(b).

1. Erasmus, as cited in A. Koestler, The Sleepwalkers (1959).

*In re Permanent Surface Mining Regulation Litigation,* 617 F.2d 807, 808 (D.C.Cir. 1980) (per curiam) (appeal from denial of preliminary injunction).

In March of 1979, the Secretary issued permanent regulations under the Act. *See* 44 Fed.Reg. 14902, 15312–463 (1979) (codified at 30 C.F.R. pts. 700–890 (1979).[2] Among these rules are specifications for the minimum information that a state must require in a permit application before the Secretary will approve the state's program and allow it to assume control of mining within its borders. *See* 30 C.F.R. pts. 778–784. These requirements are much more detailed than the information the Act itself prescribes for applicants to submit to the appropriate regulatory authority. *Compare id. with* Act §§ 507–508, 30 U.S.C. §§ 1257–1258.[3]

Various mining states, firms, and trade associations filed a total of nine actions in the United States District Court for the District of Columbia challenging most aspects of the Secretary's permanent regulations, including the information requirements. The district court consolidated these cases and divided the issues involved into two groups, one involving statutory and other general questions and the other involving disputes on the record. The court then refused to enter a preliminary injunction against enforcement of the permit application rules. On appeal, this court affirmed the denial of interim relief as being within the district judge's discretion. *In re Permanent Surface Mining Regulation Litigation,* 617 F.2d 807 (D.C.Cir.1980) (per curiam), *aff'g* Civ.No. 79–1144 (D.D.C. Aug. 21, 1979) (order denying preliminary injunction). In the process, we stated that we were intimating no view on the merits of those appellants' claims. *Id.* at 809.

Since our January opinion, the district court has reached its decision on the first group of issues. As part of its opinion, the district court concluded that "the structure of the Act, the general grants of rulemaking authority, and Section 501(b) support the Secretary's power" to promulgate minimum requirements for permit applications under state programs that exceed the information required under the Act. *In re Permanent Surface Mining Regulation Litigation,* Civ.No. 79–1144, at 31 (D.D.C. Feb. 26, 1980) (memorandum and order), [hereinafter cited as District Court Opinion].[4] *See generally id.* at 30–33. On the motion of Peabody Coal Company, the district court found no just reason to delay entering judgment on this issue and, on March 17, entered a final judgment on the validity of these rules. *See generally* Fed.R.Civ.P. 54(b). Peabody, a party to the earlier appeal regarding the preliminary injunction, filed this appeal. To ensure a prompt dis-

---

**2.** Many of the parties to the present litigation in the district court also challenged the Secretary's interim regulations promulgated under §§ 501–502 of the Act, 30 U.S.C. §§ 1251–1252. *See In Re Surface Mining Regulation Litigation,* 627 F.2d 1346 (D.C.Cir.1980), *aff'g in part, rev'g in part, and remanded* 452 F.Supp. 327, 456 F.Supp. 1301 (D.D.C.1978).

**3.** Numerous provisions of the regulations go far beyond the language of §§ 507 and 508. For example, the rules specify that maps filed with a permit application must identify the uses of existing buildings and the location of roads, cemeteries and Indian burial grounds, park trails, and areas listed or eligible for listing in the National Register of Historic Places. 30 C.F.R. §§ 779.24(d), (h)–(k), 783.24(d), (h)–(k). The Act does not require submission of this information. *See* Act § 507(b)(13), 30 U.S.C. § 1257(b)(13). Under the regulations, the applicant also must list all other permits needed to conduct the proposed mining activi-

ties and include in the list the name and address of the regulating authority, permit identification numbers, and the present status of these other permit applications. 30 C.F.R. §§ 778.19, 782.19. The applicant must describe existing structures and provide maps identifying the location of various buildings, facilities, and operational areas to be used in mining activities. *Id.* §§ 780.14, 784.14. The applicant's reclamation plan must describe stream diversions, impacts on parks and historic places, road relocations, disposal of excess wastes, and transportation facilities. *Id.* §§ 780.29–.38, 784.17–.19, .22. The Act has no comparable provisions for any of the foregoing requirements either. *See* Act §§ 507–508. Likewise, the regulations specify in great detail what the blasting plan required under § 507(g), 30 U.S.C. § 1257(g), must include. 30 C.F.R. §§ 780.13, 784.13.

**4.** For the text of § 501(b), 30 U.S.C. § 1251(b), see page 530 *infra.*

position of the significant question presented, this court granted expedited consideration before the division of the court which heard the appeal concerning preliminary relief.

## II.

### A.

I begin my effort to construe the Secretary's powers under the Surface Mining Act by examining the language of the Act itself. *See, e. g., Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976); *Zerilli v. Evening News Association*, 628 F.2d 217 (D.C.Cir.1980). The Secretary relies primarily on two provisions to demonstrate that Congress granted him authority to issue minimum standards for state permit applications. I do not believe these sections are so clear as the Secretary contends.

The first of the two provisions, section 201(c)(2), authorizes the Secretary to "publish and promulgate such rules and regulations as may be necessary to carry out the purposes and provisions of this Act ...." 30 U.S.C. § 1211(c)(2). The Secretary asserts that this clause is a grant of general rulemaking power that enables him to impose additional information requirements for permit applications. I have two problems with this analysis. First, section 201(c)(2) itself states that the regulations must "be necessary to carry out the purposes and provisions of this Act ...." This language still begs the question of whether prescribing additional information requirements for states to demand in permit applications is consistent with the Act. I am thus left precisely where I began. Second, I am not satisfied with either party's invocation of the long-standing canon of statutory construction that an act's provisions should be read so as to render none super-

fluous. *See generally* 2A Sutherland Statutory Construction § 46.06 (4th ed. C. Sands 1973). Peabody initially argued that reading section 201(c)(2) as a grant of general rulemaking authority makes the twenty specific grants in the Act meaningless. The district court turned this proposition around to hold that reading section 201(c)(2) otherwise makes it superfluous. *See* District Court Opinion at 32. In short, any broad reading of the Act's rulemaking provisions will make section 201(c)(2) redundant of the specific grants or vice versa. I cannot base a decision on a method of statutory construction that, when applied to this Act, is so hopelessly circular. *Cf. American Radio Relay League, Inc. v. FCC*, 617 F.2d 875, 879 (D.C.Cir.1980) (courts will not give independent meaning to a word that, in context, appears to be simply surplusage).

Section 501(b) of the Act gives me more pause. It empowers the Secretary to "promulgate and publish ... regulations ... establishing procedures and *requirements* for preparation, submission, and *approval* of State programs ...." 30 U.S.C. § 1251(b) (emphasis added). This language can be read to allow regulations detailing minimum standards that all state programs must meet to receive the Secretary's approval. Equally plausible, however, is a construction that allows these requirements to pertain only to areas in which the Act otherwise allows the Secretary to set nationwide performance standards for states to enforce. *See* Act §§ 515–516, 30 U.S.C. §§ 1265–1266.[5] Alternatively, section 501(b) could pertain only to nonsubstantive requirements for processing state programs through the Secretary's office. In any event, the language of the statute "is hardly free from ambiguity, and there is no clear literal meaning that we are bound to give effect." *United States v. Davis*, 617 F.2d 677 (D.C.Cir.1979).[6]

---

**5.** Peabody, in its initial brief filed in conjunction with the appeal of the denial of preliminary relief, conceded that the Secretary may issue regulations establishing nationwide performance standards under §§ 515 and 516 of the Act, 30 U.S.C. §§ 1265–1266. *See In re Permanent Surface Mining Regulation Litiga-*

*tion*, 617 F.2d 807 (D.C.Cir.1980), Joint Brief of Appellants at 7, 19. I assume, but do not decide, that this construction is correct.

**6.** The Secretary relies less heavily on two other provisions of the Act. The first is the requirement that states demonstrate they have "the

### B.

I next turn to the Act's legislative history in the hope that it will shed some light on the statute's words. Unfortunately, this, too, is a blind alley. The Senate report, the House report, the conference report, and the floor debate are all silent on whether the Secretary may add application specifications beyond those enacted in sections 507 and 508.

The Secretary at one point refers us to the House report's discussion of section 501(b). This passage states, in full: "Subsection (b) gives the Secretary up to 1 year to promulgate regulations to implement the full regulatory program including technical requirements, permits process[es], and procedures for submission of State programs." H.R.Rep.No.95–218, 95th Cong., 1st Sess. 62 (1977), *reprinted in* [1977] U.S.Code Cong. & Ad.News 593, 601. Once again, I do not believe this language is clear at all. The single sentence appears in a short summary of section 501 and simply describes section 501(b) as giving the Secretary rulemaking power for the "full regulatory program," then lists specific examples. It does not purport to define what the "full regulatory program" and its limits are. To determine what the Secretary may do in relation to "technical requirements, permit process[es], and procedures for submission of State programs," as well as other areas, one still must turn to the substantive provisions of the Act that allocate authority between the Secretary and state regulatory agencies. The Secretary, the parties agree, is empowered to establish technical performance standards.[7] Likewise, he clearly has full control over the permitting process in two instances: mining on federal land, *see* Act § 523, 30 U.S.C. § 1273, and mining in states that do not submit satisfactory regulatory

programs, *see id.* § 504, 30 U.S.C. § 1254. I still must decide how much further his authority over the permitting process extends—in particular, how control over permitting is allocated between the Secretary and the state regulatory authority when the state wishes to assume responsibility for mining within its borders.

### III.

With no clear meaning arising from the language of the Act itself or Congress's discussion of it, I must now look broadly at the Act's purposes and structure to decide which approach is more faithful to Congress's overall design. *See, e. g., United States v. Bornstein,* 423 U.S. 303, 310, 96 S.Ct. 523, 528, 46 L.Ed.2d 514 (1976). My examination indicates that Congress intended to vest in the states primary regulatory and decisionmaking authority and to place the Secretary in an oversight role to ensure that the states provide some minimal level of regulation and control. From there, I conclude that the Act itself defines the minimum information permit applications must contain and that the Secretary's authority in this area is limited to determining whether the states have satisfied that minimum. With this understanding, I would hold that the Secretary lacks power to demand that states require more information from applicants than the Act itself spells out.

### A.

Congress listed among the purposes of the Act a desire to "establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations . . . ." Act § 102(a), 30 U.S.C. § 1202(a). It nonetheless found

---

capability of carrying out the provisions of this Act and meeting its purposes through . . . (7) rules and regulations consistent with regulations issued by the Secretary pursuant to this Act." Act § 503(a), 30 U.S.C. § 1253(a). The second defines "State program" as meaning "a program established by a State pursuant to section 503 . . . in accord with the requirements of this Act and regulations issued by the Secretary pursuant to this Act . . . ." *Id.*

§ 701(25), 30 U.S.C. § 1291(25). These clauses have the same problem of circularity I found with § 201(c)(2), as discussed in the text: the state must conform only to those regulations that are consistent with the Act, so we still must decide whether these particular regulations conform to the Act's purposes.

7. *See* note 5 *supra.*

that due to variations in local conditions, *"primary governmental responsibility for developing, authorizing, issuing, and enforcing regulations for surface mining and reclamation operations subject to this Act should rest with the States...."* Id. § 101(f), 30 U.S.C. § 1201(f) (emphasis added). The federal government, of course, *"assist[s] the States in the development of State programs for surface coal mining and reclamation operations which meet the requirements of the Act, and at the same time, reflect local requirements and local environmental and agricultural conditions...."* Id. § 201(c)(9), 30 U.S.C. § 1211(c)(9) (emphasis added). *Accord, id.* § 102(g), 30 U.S.C. § 1202(g). The overall structure thus is one in which the Act will *"be enforced by the State[s] with backup authority in the Department of the Interior."* H.R.Rep.No.95–218, *supra* at 57, *reprinted in* [1977] U.S.Code Cong. & Ad. News at 595 (emphasis added). *See id.* at 129 ("primary regulatory authority" delegated to states with "a limited Federal oversight role" in the enforcement program), *reprinted in* [1977] U.S.Code Cong. & Ad.News at 661.

The Act's allocation of authority reflects these aims. Under an approved state program, the local regulatory authority decides whether to issue permits for coal mining. Act § 510, 30 U.S.C. § 1260. The state authority must operate within certain boundaries prescribed by the Act, and its determination whether to grant a permit request is reviewable in state courts, *id.* § 526(e), 30 U.S.C. § 1276(e), but the Secretary is not involved in this process.[8] Only if the state authorities subsequently fail to enforce their local program may the Secretary assume control of mining within that state, and he may do so then only after following certain procedures in which the state participates. *Id.* § 521(b), 30 U.S.C. § 1271(b). This scheme leaves broad discretion in state officials while ensuring, through federal oversight, that the minimum requirements of the Act are achieved.[9]

#### B.

Ordinarily, logic dictates that the entity vested with the power to make a given decision implicitly is left with the power to determine what information it needs to make that decision. In the case of state regulatory authorities, however, Congress wished to make sure that the permit-granting entities would have adequate information:

> Experience has shown that without a thorough and comprehensive data base presented with the permit application, and absent analysis and review by both the agency and by other affected parties based upon adequate data, [this] judgment has often traditionally reflected the economic interest in expanding a State's mining industry. Valid environmental factors tend to receive short shrift. To meet this problem *the bill delineates in detail the type of information required in permit applications* in sections 507 and 508 *and the criteria for assessing the merits of the application* in section 510.

H.R.Rep.No.95–218, *supra* at 91, *reprinted in* [1977] U.S.Code Cong. & Ad.News at 627 (emphasis added). These informational specifications are the "minimum uniform

---

**8.** While the bill that became the Surface Mining Act was pending, Secretary of the Interior Cecil K. Andrus wrote to Representative Morris K. Udall, chairman of the House committee considering the bill, and asked in part that his Department be given authority to intervene in the permit process. *See* H.R.Rep.No.95–218, 95th Cong., 1st Sess. 156 (1977) (letter from Sec'y Andrus to Rep. Udall), *reprinted in* [1977] U.S.Code Cong. & Ad.News 593, 687. Congress apparently rejected this request.

**9.** The Secretary insists that he has left this discretion intact through the so-called "state

window" provision in the regulations. This section allows states to propose alternatives that are "consistent with the regulations" the Secretary has issued. 30 C.F.R. § 731.13(c)(1). The language of this provision, however, is deceptively comforting. Elsewhere, the regulations define "consistent with" as meaning "no less stringent than and meet[ing] the applicable provisions of the regulations the Secretary has issued. *Id.* § 730.5(b). Thus, there is little room for states to maneuver. The "window" would be more accurately described as a one-way mirror.

requirements" that all states must demand of permit applicants. S.Rep.No.95–128, 95th Cong., 1st Sess. 53 (1977).

That Congress chose to mandate a minimum amount of information in permit applications does not mean that it intended to give the Secretary the power to require even more information when he is not the permit-granting authority. Indeed, in a system that, as one of its central goals, vests "primary governmental responsibility" in the states, it is more reasonable to construe sections 507 and 508 as carefully devised exceptions to the general, common-sense proposition that the decisionmaker is in the best position to decide what information it needs. True, the Secretary is the federal official who approves state programs, but the power to approve or to reject state programs does not necessarily include the power to specify the criteria of decision. The Act goes into unusually great detail in stating what a permit application must contain.[10] It also states in detail the factors that must be present before the Secretary may approve a proposed program. See Act § 503, 30 U.S.C. § 1253. A construction that would allow the Secretary to expand these requirements as he saw fit in effect would permit him, by regulation, to take away the very discretion Congress sought to vest in the states.[11] Like the camel sticking his nose in the tent, the Secretary easily could take over entirely. I will not construe a statute "in a manner

10. The requirements set out in more than a score of paragraphs in sections 507 and 508, 30 U.S.C. §§ 1257 & 1258 (Supp. I 1977), are indeed both extensive and detailed, listing with considerable particularity the necessary contents of each application and reclamation plan. This is not a case in which Congress outlined a scheme, leaving the details of its implementation to the Secretary. Instead, it is a case in which Congress, wanting to commit the substance of its compromise on the surface mining question to law, specified the details itself.

The majority rejects any inference based upon the "mere length or specificity" of sections 507 and 508 on the grounds that the legislative history of section 515, a longer and more detailed section, makes it clear that the Secretary's regulations are expected to "flesh out" the statutory requirements. Majority opinion at 527. I believe that the different function served by section 515 makes any comparison irrelevant. That the Secretary's expertise should be of some use in the formulation of environmental protection performance *standards* by no means dictates the conclusion that the Secretary should be able to tell the states what information to require on permit applications. *See* note 5 *supra*.

11. The Secretary argues that his construction ·of the Act deserves considerable deference because his Department is the agency Congress has empowered to implement the Act. *See, e. g., Whirlpool Corp. v. Marshall*, 445 U.S. 1, 11, 100 S.Ct. 883, 890, 63 L.Ed.2d 154 (1980). Despite this general rule, a court always remains free to reach its own conclusion concerning what a particular statute means. *E. g., Skidmore v. Swift*, 323 U.S. 134, 139–40, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). In deciding how much deference to pay an agency's interpretation, a court must look in part to "the nature of [the agency's] expertise." *Batterton v. Francis*, 432 U.S. 416, 425 n.9, 97 S.Ct. 2399, 2405 n.9,

53 L.Ed.2d 448 (1977). In this case, the question of whether the Secretary may issue detailed regulations about what a permit application must contain is "a narrow legal issue that is readily susceptible of judicial resolution." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 120, 100 S.Ct. 2051, 2062, 64 L.Ed.2d 766 (1980). Moreover, the *fundamental issue in the case before us is* whether Congress intended to vest in the Secretary discretion over the contents of permit applications—in other words, whether Congress intended to give him the very discretion on which he now relies. Under these circumstances, I feel free to reach a decision based on my own independent analysis.

For similar reasons, I must reject the Secretary's reliance on the Supreme Court's decision in *E. I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977). In *du Pont*, the Court upheld the authority of the Administrator of the Environmental Protection Agency to set precise, industrywide standards for effluent emissions under § 301 of the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1311 (1976). Those regulations thus concerned the substantive performance standards, which Congress clearly authorized the Administrator to set. The regulations at issue in this appeal, however, do not relate to substantive environmental standards, over which I have assumed the Secretary has complete control, *see* page 518 and note 5 *supra*, but to information that the permit-granting authority requires for the application process. *See* note 10 *supra*. Furthermore, the language of the statute in *du Pont* was far clearer in authorizing the Administrator of EPA to set performance standards than is this Act concerning the Secretary of the Interior's power over application requirements.

**534**

which runs counter to the broad goals which Congress intended it to effectuate." *FTC v. Fred Meyer, Inc.*, 390 U.S. 341, 349, 88 S.Ct. 904, 908, 19 L.Ed.2d 1222 (1968).

C.

My conclusion does not mean that the Secretary plays no role in the implementation of sections 507 and 508. On the contrary, under the Act, he must refuse to approve any particular state's proposed program if it appears inadequate to obtain the information sections 507 and 508 require of applicants. The Secretary may issue interpretive rulings, if he so desires, clarifying what he believes individual provisions of these two sections mean. He also is free to recommend that state authorities adopt application requirements more stringent than those spelled out in the Act itself. Finally, if a state fails to abide by its responsibilities under the Act, the Secretary may enforce the Act against particular mines, *see* Act § 521(a)(2), 30 U.S.C. § 1271(a)(2), and, after following certain procedures, assume full authority for issuing and enforcing permits within that state, *see id.* § 521(b), 30 U.S.C. § 1271(b). Until such inadequate enforcement appears, however, the Secretary's actual power to compel compliance with his wishes is limited to approving state programs based on the criteria set forth in the Act, *see id.* § 503, 30 U.S.C. § 1253, and to monitoring success through the federal inspection systems, *see id.* § 517, 30 U.S.C. § 1267.[12]

IV.

Congress intended states to assume the "primary governmental responsibility" for enforcing the Surface Mining Act. To ensure states would live up to this duty, the Secretary of the Interior was given certain supervisory power. We would turn Con-

gress's scheme on its head were we to allow that supervisory authority to consume state discretion and to reduce state power to a purely ministerial implementation of a federally devised program.

I realize, of course, that my construction of the Act is the product of a general view of the distribution of authority Congress was trying to strike. Neither the language of the statute itself nor its legislative history has given us a clear path to take. Senate activity concerning these provisions in the last Congress, *see* S. 1403, 96th Cong., 1st Sess., 125 Cong.Rec. S12350 (daily ed. Sept. 11, 1979),[13] gives some consolation, however, for I assume that Congress will correct the majority decision if it disagrees or will change the scheme it enacted if it now believes another approach would be more satisfactory.

For the foregoing reasons, I would reverse the judgment of the district court and remand with instructions that the regulations be returned to the Secretary for further consideration in light of these views.

MacKINNON, Circuit Judge, dissenting:

My views coincided with the original majority opinion of the Division in this case and they concur with those now expressed in Judge Tamm's dissent. As I stated previously, to allow the Secretary's overly comprehensive regulations to preempt the authority of the states to act in the first instances, would as a practical matter, operate to stifle the activity of all the states in their handling of what Congress has indicated to be largely local state problems. Congress did not express an intent to so limit the authority of the states. In effect the Secretary's regulations practically smother all state initiative. Thus, to uphold the excessively broad regulations violates the Congressional intent in an unusual

12. Because I conclude that the regulations at issue violate the Act, I do not reach Peabody's contention that the Act, if it did authorize the regulations, would violate the tenth amendment.

13. This bill in part would have deleted the language in § 503(a)(7) of the Act, 30 U.S.C.

§ 1253(a)(7), that state laws and regulations must conform with the Secretary's regulations. The bill passed the Senate on September 11, 1979. *See* 125 Cong.Rec. S12387 (daily ed. Sept. 11, 1979). It was referred to the House Committee on Interior and Insular Affairs on September 13, 1979.

way. The Secretary's action in this case is a prime example of the extravagant expansion of federal power by departmental *regulations* that will have the effect of law.

I cannot read the.regulations in question as the majority asserts, as being limited to "providing *oversight*, advice, and back-up authority, and the states bearing the majority responsibility for implementation of the Act." Maj. Op. at 516 (emphasis added). If the regulations were so limited I would support them.

The majority states that its "inquiry is narrow," but it expands this narrow jurisdiction into a very far reaching order. As the majority recognizes Congress delegated "*primary* regulatory authority to the States" and "a limited Federal oversight role" was given to the Secretary. Maj. Op. at 520. In my view the majority has overly expanded an *oversight* role into a role that permits the Secretary to *formulate* organizational and *operational* rules for the states. This is a great deal more than "oversight." I would restrict the Secretary on initial approvals to the specific confines of the data that Congress specified in the statute.

In my view the cardinal error made by the majority opinion appears on page 518 where it states:

> The Secretary's primary means of guaranteeing effective state programs lies in his *approval function* at the beginning of the process.

Maj. Op. at 520 (emphasis added). There is nothing in the statute, experience or logic to support that statement and it is the keystone the majority relies upon to support its expansion of the Secretary's power. The primary means of guaranteeing effective state programs lies in the *inspection function* which continues as long as mining operations continue. It would be pure folly to rely principally upon the approval at the beginning.

It is thus my opinion that the majority has expanded the Secretary's authority beyond the intent of the statute at the expense of authority that Congress intended to be exercised by the states in the first instance.