MEMORANDUM

ROBERTSON, District Judge.
Plaintiff National Mining Association (NMA.) [1] whose members include coal mining companies, coal owners, and utilities, challenge certain reporting and auditing regulations, 30 C.F.R. §§ 870.5, 870.15, and 870.17, promulgated by the Office of Surface Mining Reclamation and Enforcement pursuant to Title IV of the Surface Mining Control and Reclamation Act (SMCRA), 30 U.S.C. § 1201 et seq. Before the court are the parties’ cross-motions for summary judgment. For the reasons set forth below, the defendants are entitled to judgment as a matter of law. Background
Congress enacted SMCRA in 1977 to promote, among other things, the reclamation of abandoned mine lands. See 30 U.S.C. § 1202(h). Under Title IV of the Act, coal mine operators must pay into an “Abandoned Mine Reclamation Fund” (the AML Fund) fees based on the tonnage of coal they mine each quarter. 30 U.S.C. § 1232(a). Monies deposited into the AML Fund are then used to reclaim and restore land and water adversely affected by past coal mining. 30 U.S.C. § 1231(c). To provide a basis for assessing fees, SMCRA requires “all operators of coal mine operations [to] submit a statement of the amount of coal produced during the calendar quarter, the method of coal removal and the type of coal.” 30 U.S.C. § 1232(c).
Congress created the Office of Surface Mining Reclamation and Enforcement (OSM) to implement the provisions of the Act. In 1982, OSM promulgated regulations setting forth the information required in the quarterly reports of mine operators and authorizing audits to ensure that mine operators were paying appropriate fees into the AML Fund. 30 C.F.R. §§ 870.15(b), 870.17 (1982). Section 870.15(b) of those regulations required operators to report the “tonnage of coal sold, used, or ownership transferred during the applicable calendar quarter.” Section 870.17 authorized OSM officers to examine the records of operators and “second parties,” those who buy coal from, or sell coal to, an operator. The rationale behind the auditing regulation was straightforward: records from “second parties” would permit OSM to confirm the accuracy of the operators’ quarterly reports.
Congress amended Title IV of SMCRA in 1990, modifying several aspects of the abandoned mine reclamation program. Pub.L. No. 101-508, at §§ 6001-6014. The amended statute expanded operators’ reporting requirements and, for the first time, expressly required the Secretary of the Interior to conduct audits to verify the accuracy of reported information.[2]
*11 After the enactment of these amendments, OSM proposed revisions to its implementing regulations. After notice and comment, including extensive commentary from NMA’s predecessor organizations, OSM promulgated revised versions of § 870.15(b) and § 870.17 and added to § 870.5 a corresponding definition of the term “mineral owner.” In promulgating the regulations, OSM relied on the language of the 1990 amendments, and on its general rulemaking authority under 30 U.S.C. § 1242(a) and 80 U.S.C. § 1211(c)(2).[3] It is those revised regulations that NMA challenges here.
Reporting Requirements
Revised § 870.15(b) requires mine operators to disclose in their quarterly reports any person owning more than 10 percent of the mineral estate that is the subject of the SMCRA permit as well as anyone purchasing more than 10 percent of that quarter’s coal production. The regulation also incorporates § 870.5’s definition of “mineral owner,” which provides that “[i]f there are several persons who have successively transferred the mineral rights, information shall be provided on the last owner(s) in the chain prior to the permittee, i.e. the person or persons who have granted the permittee the right to extract the coal.” [4] Information provided pursuant to § 870.15(b) will be kept confidential upon request, except where disclosure of the information is otherwise required by statute or regulation.
NMA argues, inter alia, that (1) OSM does not have the authority to require operators to report the “last owner” of the mineral rights; (2) that OSM failed to state in the proposed rulemaking notice that the “last owner” provision was being considered; and (3) that OSM has failed to adequately address NMA’s concerns, raised in its comments on the proposed regulations, about the confidentiality of owner and purchaser information contained in the quarterly reports.

1. Statutory Authority

Title 30 U.S.C. § 1232(c) unambiguously requires mine operators to report, among other things, “the owner of the coal.” The same section also requires, however, that operators report “any changes in information ... since the date of the preceding quarterly report,” leaving open to interpretation the question whether all interim transfers of ownership must be reported as well. Sections 870.5 and 870.15 of the regulations provide necessary clarification, requiring, in cases of successive transfers of mineral rights, only that the mine operator report the owner who “granted the permittee the right to extract the coal.” That requirement represents a permissible construction of the statute’s reporting requirements. See Chevron U.S.A, Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43,104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984).
Even if § 870.15(b) required the reporting of information not specified in § 1232(e), OSM has the authority, pursuant *12 to its general rulemaking powers, 30 U.S.C. §§ 1242(a) and 1211(c)(2), to require that mine operators report information beyond what is specifically called for in the Act. See In re Permanent Surface Mining Regulation Litigation, 653 F.2d 514 (D.C.Cir.1981).

2. Promulgation

The Administrative Procedure Act (APA) requires that notices of proposed rulemaking reveal “either the terms or substance of the proposed rule or a description of the subjects and issues involved.” 5 U.S.C. § 553(b)(3).
OSM did not provide express notice of the “last owner” provision in its proposed rule. OSM did, however, provide notice that it was considering issuing regulations on “who qualifies as a reportable mineral owner and reportable purchaser” and noted that the 1990 Amendments “require that mine operators report changes in ownership.” The “last owner” provision in the published regulations is a clarification: that operators need not report every change in ownership of the mineral estate pursuant to § 1232(c)’s updating requirement. It concerns the same subject as, and is a development from, the proposed rule. It need not have been republished for notice and comment. See Ethyl Corp. v. EPA, 541 F.2d 1, 48 (D.C.Cir.), cert. denied, 426 U.S. 941, 96 S.Ct. 2662, 2663, 89 L.Ed.2d 394 (1976) (notice need not contain “every precise proposal which [the agency] may ultimately adopt as a rule”); Connecticut Light & Power Co. v. Nuclear Regulatory Comm’n, 673 F.2d 525, 533 (D.C.Cir.), cert. denied, 459 U.S. 835, 103 S.Ct. 79, 74 L.Ed.2d 76 (1982) (agency need not republish for notice and comment rules that follow logically from, or that reasonably develop, the rule as originally proposed).

3. Confidentiality

The fundamental purpose of the APA’s requirement that an agency respond to criticisms of proposed rules is “to show that the agency has indeed considered all significant points articulated by the public.” Natural Resources Defense Council, Inc. v. EPA 859 F.2d 156, 188-89 (D.C.Cir.1988). In its final rulemaking, OSM included a discussion of plaintiffs concerns about disclosure of owner and purchaser information. After reviewing the comments in some detail, OSM concluded:
With regard to these comments on privacy, OSM accepts the comments in part. OSM has concluded that the comments, by themselves, do not establish a reason to believe that disclosure of this information may result in competitive harm. However, OSM recognizes eommenters’ concerns that they be able to request confidentiality for certain information submitted under [30 U.S.C. § 1232(c) ].
In an effort to accommodate NMA and other commentators, OSM amended § 870.15 to provide mine operators the option to designate information in their quarterly reports as confidential. Information so designated is offered some protections from disclosure under the Department of the Interior’s FOIA regulations. See 43 C.F.R. 2.15(d).
Plaintiff argues, however, that the confidentiality provision of § 870.15 is rendered toothless by OSM’s intention to place information from the quarterly reports on the agency’s Application Violator System (AVS), to which a variety of agencies and private parties have access, as opposed to the AML Fund fee database (AMLFCS) which is nonpublic. This argument, of course, is not about whether or not OSM considered plaintiffs concerns, but about whether OSM acted on those concerns to NMA’s satisfaction.
In any event, OSM’s choice of database was not arbitrary, capricious or inconsistent with the Act. While 30 U.S.C. § 1232(c) requires that information from operators’ quarterly reports be placed on a computer database, it is silent as to what database. OSM selected the AVS database because “[a]t the time of the 1990 Amendments, Congress was aware that OSM maintained the AVS as the pertinent database for including such information.” 59 F.R. 28145 (1994). As defendants point out, the AVS database was the subject of congressional attention preceding the 1990 Amendments. Moreover, the AVS database, which houses SMCRA permit application data, already contains information on coal ownership and at least some information on coal purchasers, and is used by OSM *13 and the Internal Revenue Service in the collection of AML fees. In contrast, the AMLFCS database appears to be an accounting system, recording AML Fund fee payments and delinquencies.
Particularly in light of § 1232(e)’s requirement that operators specify their SMCRA permit numbers and mine safety and health identification numbers in their quarterly reports, OSM’s intention to “link” this information with permittee data of a similar nature in the AVS system is neither inconsistent with SMCRA or unreasonable.[5]
Auditing Authority
Revised § 870.17 gives the Secretary of the Interior, and by designation, OSM, the authority to conduct audits of “coal sales, transfers, and use, and the payment of [Fund] fees as may be necessary to ensure compliance with the Act....” In connection with such audits, the Secretary may inspect the records of “any person involved in a coal transaction.”[6]
NMA challenges § 870.17 on two grounds. First, NMA argues that OSM has exceeded its statutory authority by allowing inspection of records of persons not subject to Title IV of the Act. Second, NMA claims that the regulation violates the Fourth Amendment.

1. Statutory Authority

While 30 U.S.C. § 1232(d)(2) does not provide authority for audits or inspections of those not directly regulated under SMCRA I cannot agree with NMA’s contention that the section limits the power OSM has under SMCRA’s general rulemaking provisions to promulgate regulations that authorize broader audits and record inspections. Section 1232(d)(2) contains no express limitation, and the sparse legislative history of the 1990 Amendments contains no indication of an intent to limit OSM’s past practice of inspecting the records of non-operator “second parties.” [7] It is established that specific grants of authority do not limit OSM’s general rulemaking power. In re Permanent Surface Mining Regulation Litigation, 653 F.2d 514, 523 (D.C.Cir.1981).
The general rulemaking power is found at 30 U.S.C. § 1242(a), which grants the Secretary the authority to “engage in any work and do all things necessary or expedient, including promulgations of rules and regulations, to implement and administer the provisions of [Title IV].” 30 U.S.C. 1242(a). Where the empowering provision of a statute states simply that an agency may make such rules and regulations as necessary to carry out the provisions of an act, the validity of a regulation promulgated thereunder will be sustained so long as it is “reasonably related to the purposes of the enabling legislation.” Mourning v. Family Publications Service, Inc., 411 U.S. 356, 369, 93 S.Ct. 1652, 1660-61, 36 L.Ed.2d 318 (1973) (quoting Thorpe v. Housing Authority of City of Durham, 393 U.S. 268, 280-81, 89 S.Ct. 518, 525-26, 21 L.Ed.2d 474 (1969)). See also In re Permanent Surface Mining Regulation, 653 F.2d at 521 & n. 12.
In its comments to the proposed revision of § 870.17, NMA argued that OSM’s author *14 ity to inspect the records of “second parties” was sufficient to ensure that operators’ reports of coal tonnage and AML Fund fees were accurate, and, therefore, that inspection of the records of royalty recipients and end-users of coal was unnecessary. The Secretary, obviously, did not see it that way. The issue is not whether NMA or the Secretary has the better of that argument, but whether OSM had the statutory authority to issue the regulation. The inspection of records of parties to a coal transaction, be they the records of “second parties,” royalty recipients or end-users, is for the purpose of identifying mine operators who have shirked responsibility for paying fees and to identify coal sales or transfers. 59 F.R. 28147 (1994). Not even NMA’s argument has identified any legal distinction between “second parties” and others with information on a mine operator’s coal production or sales. None are “operators.” The present § 870.17, like its predecessor, is reasonably related to Title IVs goal of securing reclamation fees from mine operators, and it was within OSM’s power to promulgate the regulation.
Finally, § 870.17 is not arbitrary or capricious. The basis and purpose statement accompanying § 870.17 contains support for OSM’s decision to authorize the inspection of records of non-operators. See In re Surface Mining Regulation Litigation, 456 F.Supp. 1301, 1308 (D.D.C.1978) (substantial evidence not required, but agency must show support for regulations in basis and purpose statement or administrative record). Access to “second party” information, pursuant to the prior version of § 870.17, has allowed OSM auditors to identify substantial sums of unpaid fees.[8] 59 F.R. 28147 (1994). Based on this experience, OSM could reasonably conclude that data from coal buyers and royalty information would be an “aid in validating the tonnage subject to fees.” Id.

2. Fourth Amendment

When authorized by law, an administrative agency may conduct reasonable investigations, including the examination of corporate records, without violating the Fourth Amendment’s prohibition against warrantless searches and seizures. See See v. Seattle, 387 U.S. 541, 544-45, 87 S.Ct. 1737, 1739-40, 18 L.Ed.2d 943 (1967); Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 208, 66 S.Ct. 494, 505, 90 L.Ed. 614 (1946). SMCRA expressly authorizes OSM to “make those investigations and inspections necessary to insure compliance with this chapter; conduct hearings, administer oaths, issue subpoenas, and compel the attendance of witnesses and production of written or printed material as provided for in this chapter.” 30 U.S.C. § 1211(c)(1).
Section 870.17 authorizes OSM to access records only for the purpose of conducting audits “to ensure compliance with the provisions of the Act.” In addition, access is limited to “reasonable times upon request” of the agency. The regulation does not, on its face, authorize warrantless searches or seizures of property. A party to whom OSM has made a request for inspection of documents pursuant to § 870.17 might have a basis grounded in the facts of a specific case to challenge that specific order or subpoena on Fourth Amendment grounds, but NMA’s facial challenge to § 870.17 fails as a matter of law.
An appropriate order accompanies this memorandum.

ORDER

For the reasons set forth in the accompanying memorandum, it is this 23rd day of July, 1996, ordered that defendants’ motion for summary judgment [# 9] is granted and the case is dismissed.

. The National Coal Association and the American Mining Congress, original plaintiffs in this case, merged to form NMA after this litigation began.

. The revised reporting requirements, 30 U.S.C. § 1232(c) (1990), provide in relevant part:
Together with such reclamation fee, all operators of coal mine operations shall submit a statement of the amount of coal produced during the calendar quarter, the method of coal removal and the type of coal_ Such statement shall include an identification of the per-mittee of the surface mining operations, any operator in addition to the permittee, the owner of the coal, the preparation plant, tripple [sic], or loading point for the coal, and the person purchasing the coal from the operator. ... Each quarterly report shall contain a notification of any changes in the information required by this subsection since the date of the preceding quarterly report. The information contained in the quarterly reports under this subsection shall be maintained by the Secretary in a computerized database.
The new auditing requirements are set forth at 30 U.S.C. 1232(d)(2) and provide that:
The Secretary shall conduct such audits of coal production and the payment of fees under this subchapter as may be necessary to ensure full compliance with the provisions of this sub-chapter. For the purposes of performing such audits the Secretary [or his designee] shall, at all reasonable times, upon request, have access to, and may copy, all books, papers, and other documents of any person subject to the provisions of this subchapter. The Secretary may at any time conduct audits of any surface coal mining and reclamation operation, including without limitation, tipples and preparation *11 plants, as may be necessary in the judgment of the Secretary to ensure full and complete payment of the fees under this subchapter.

. 30 U.S.C. § 1242(a) provides:
The Secretary or the State pursuant to an approved State program, shall have the power and authority, if not granted it otherwise, to engage in any work and do all things necessary or expedient, including promulgations of rules and regulations, to implement and administer the provisions of this subchapter.
30 U.S.C. § 1211(c)(2) provides that the Secretary, acting through OSM, shall “publish and promulgate such rules and regulations as may be necessary to cany out the purposes and provisions of this chapter.”

. 30 C.F.R. § 870.15(b) provides:
Each operator ... shall report tonnage of coal sold, used or transferred, as well as the name and address of any person or entity who, in a given quarter, is the owner of 10 percent or more of the mineral estate for a given permit, and any entity or individual who, in a given quarter, purchases ten percent or more of the production from a given permit during the applicable quarter. If no single mineral owner and purchaser meets the 10 percent rule, then the largest single mineral owner and purchaser shall be reported. If several persons have successively transferred the mineral rights, information shall be provided on the last owner(s) in the chain prior to the permittee, i.e. the person or persons who have granted the per-mittee the right to extract the coal. At the time of reporting, a submitter may designate such information as confidential.
The definition of “mineral owner” in 30 C.F.R. § 870.5 tracks the language of § 870.15.

. Such linkage was discussed by commentators on the proposed rulemaking. See e.g., Administrative Record at 410 (letter dated February 24, 1992, from the Kentucky Resources Council), 443 (Public Hearing, February 19, 1992, testimony of Gene Conrad, Interstate Mining Compact).

. 30 C.F.R. § 870.17 provides:
The Secretary [or his designee] may conduct such audits of coal sales, transfers, and use, and the payment of [Fund] fees as may be necessary to ensure compliance with the provisions of the Act, and for such purposes shall, at all reasonable times, upon request, have access to, and may copy, all books, papers, and other documents of any person involved in a coal transaction, including without limitation, per-mittees, operators, brokers, purchasers, and persons operating preparation plants and tip-pies, and any recipients of royalty payments for the coal.

.A Committee Report on H.R. 2095, a bill which contained reporting and auditing provisions nearly identical to those ultimately enacted in the 1990 amendments, provides the only indication of Congressional intent. It states in relevant part:
Subsection (d) provides for the Secretary to conduct audits to insure payments of the reclamation fee. The Committee intends for the Secretary to develop within a reasonable period of time a plan to meet this requirement, and that such a plan would provide for auditors to verify for accuracy and completeness all representations made in the required quarterly reports.

. Aided by information from non-operators' records, OSM auditors recovered $7.3 million in unreported or under reported fees in 1993.